Filed 2/17/23  In re Z.H. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Z.H. et al, Persons Coming Under the Juvenile Court Law. | |
| | D080815 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. J520024A-B) |
| v. | |
| S.H., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Affirmed in part, conditionally reversed in part, and remanded with directions.

Anna Rak, under appointment by the Court of Appeal, for Defendant and Appellant S.H. (Mother).

Claudia Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and J. Jeffrey Bitticks, Deputy County Counsel, for Plaintiff and Respondent.

Mother appeals from the juvenile court's orders terminating her parental rights to her minor children, Z.H. and Zi.H., pursuant to Welfare and Institutions Code[1] section 366.26. She asserts that the juvenile court erred in finding the beneficial parent-child relationship exception did not apply to preclude the termination of her parental rights, and she contends she was not properly noticed of the two continued section 366.26 permanency hearings. Mother also raises but then abandons her position that the juvenile court and Agency did not comply with their inquiry duties under the Indian Child Welfare Act (ICWA, 25 U.S.C. § 1901 et seq.).

As explained below, we conclude the court did not err by finding the beneficial parent-child relationship exception inapplicable. And, although we agree that Mother was not properly noticed of the final continued section 366.26 hearing, we conclude the error was harmless. Even so, because our review indicates the inquiry required by ICWA was inadequate and that this error was prejudicial, we conditionally reverse the orders terminating parental rights and remand for the limited purpose of compliance with ICWA.

FACTUAL AND PROCEDURAL BACKGROUND

*Juvenile Dependency Petitions*

In April 2019, the San Diego County Health and Human Services Agency (the Agency) received a referral when 12-week-old Z.H. was hospitalized for "failure to thrive" due to dangerous malnourishment. Z.H. was severely underweight and had not received medical care since her birth in January. Mother fed Z.H. almond and muscle milk, and despite being 12 weeks old, Z.H. looked like a newborn. The reporting party indicated that the hospital educated Mother about Z.H.'s feeding schedule, but Mother did not

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

follow the schedule without someone directing her. Despite being given whole milk to feed her 18-month-child, Zi.H., Mother was observed putting coffee creamer packets into Zi.H.'s bottle. Hospital staff also saw Mother and her boyfriend eating the food that the nursing staff provided for Zi.H. Mother and her boyfriend were overheard calling Zi.H. "retarded" and "idiot" and threatening to put Zi.H. outside if he did not "shut up."

The Agency filed juvenile dependency petitions on behalf of Z.H. and Zi.H. the following week. Mother did not appear for the April 22, 2019 detention hearing. The juvenile court found the Agency made a prima facie showing on the petitions and detained the children in foster care.

*Jurisdiction and Disposition Hearing*

In the Agency's May 13, 2019 jurisdiction and disposition report, the Agency noted Mother had been unemployed and homeless for approximately two years. Mother admitted to using marijuana and denied using methamphetamine or cocaine, but failed to drug test. Mother missed all of the scheduled visits with the minors and did not attend the child and family team (CFT) meeting.

Since the minors had been detained, Z.H. had been attending the failure to thrive clinic twice a week and was gaining weight. Zi.H. was getting caught up on overdue vaccinations and was referred for further evaluation of a suspected speech delay. The foster mother reported that both minors had issues with food, including that they were always hungry and had to eat every couple of hours.

Mother attended a supervised visit with the minors in May 2019. The foster mother indicated that Zi.H. was not excited to see Mother and was hiding from her but eventually warmed up after a lot of prompting. At one point, Z.H. almost fell off of a table when Mother put her in her car seat on a

3

table without buckling her in and then ran after Zi.H. Mother did not want to change Zi.H.'s dirty diaper and "gave up" after feeding Z.H. only one ounce of formula, despite the foster mother explaining the importance of Z.H. drinking all of her formula due to her failure to thrive.

By June 11, 2019, Mother had visited the minors only once. Aside from a single visit with a visitation coach, Mother had not followed through on appointments with service providers or for drug treatment, and she had not attended any of the minors' medical appointments. Mother also admitted to domestic violence with boyfriend, J.R., who had an extensive criminal record.

As of the Agency's August 13 and 27, 2019 addendum reports, Mother had attended her first drug court date and was in compliance. However, Mother's in-home parenting services and visitation coaching services were both closed because of her lack of participation and attendance. Mother had not visited the minors for about a month.

At the August 27, 2019 jurisdiction/disposition hearing, the juvenile court made true findings on the petitions, removed custody from Mother, placed the minors in licensed foster care, and ordered reunification services for Mother.

*Six-Month Review Period*

As of the February 2020 review hearing, the minors had been doing well since their April 2019 placement in a resource family home. Z.H. was at a healthy weight and no longer considered a "failure to thrive child." Because there were developmental concerns for both minors, the caregiver worked to ensure that the minors received appropriate services.

Mother was also "doing well." She entered drug treatment in November 2019, was participating in her drug treatment services, and remained clean for more than 70 days. Mother attended weekly supervised

4

visits with the minors starting around October 2019, had begun attending the minors' medical appointments, and had been keeping track of their developments. Mother made contributions during CFT meetings and completed a 12-week parenting class.

A court appointed special advocate indicated Zi.H. became "more aggressive" after visits with Mother, might be on the autism spectrum, and was receiving weekly speech therapy. Z.H. began physical therapy for her " 'limp legs' " and had improved significantly.

Mother acknowledged to the Agency that her drug use affected her judgment on properly feeding the minors. The Agency recommended, and the juvenile court ordered, unsupervised visits with Mother at her sober living home.

*Twelve-Month Review Period*

By June 2020, Mother was continuing to do well in services and had been visiting with the minors twice a week for at least four hours. She completed drug treatment in February 2020, transitioned to living in a sober living facility, and was currently living with a relative. She had remained drug-free for approximately six months and was starting a new job at a casino. In April 2020, the children were placed with another relative caregiver. Zi.H. was referred for continued services due to his behavioral issues, including aggression during visits with Mother and throwing tantrums with the relative caregiver.

*Eighteen-Month Review Period*

Mother continued participating in parenting, drug treatment, drug testing, and visitation. Mother had not missed any visits with the minors during the reporting period and began overnight visits in October 2020. Although Mother attended some of the minors' medical appointments, she did

not take a more active role in participating in the minors' developmental appointments. She was referred to a visitation coach to help her manage the behavioral issues the minors were having during their visits with her.

By the Agency's December 14, 2020 report, Mother had continued regular visits with the minors and began managing their services. She was working and had three overnight visits with the minors each week.

By February 2021, Mother had her own apartment, had continued to maintain employment for approximately six months, was compliant with services, and continued to test negative for drugs. The minors began a 60-day trial visit with Mother on January 28, 2021, and the minors appeared to be doing well. The Agency recommended, and the court ordered, that the minors be placed with Mother and receive family maintenance services.

*Section 387 Petitions and Detention Hearing*

On June 15, 2021, approximately four months after the minors were placed with Mother, the Agency filed section 387 petitions alleging that Mother tested positive for methamphetamine on May 28, 2021, and for methamphetamine and cocaine on June 10, 2021, while supervising the minors. The Agency recommended the court order supervised visitation with Mother and that the minors be detained in foster care.

During this time, the social worker visited Mother in the afternoon and found Mother laying in bed with Z.H. The minors were not dressed and still in diapers, and Mother stated she had been tired lately. Mother was not honest with the Agency about her relapses. She had not been in contact with her sponsor in months and had struggled lately to follow up on the minors' appointments and schedule. She lost her job approximately two months prior and appeared overwhelmed by the change and her medical issues, and she used substances to help alleviate her physical pain.

6

Maternal great-grandmother (J.M.)[2] said the minors had been staying with her every two weeks to give Mother a break and that she had been helping Mother with diapers, food, money, and transportation. Mother did not attend the June 16, 2021 detention hearing. The court detained the minors with maternal great-grandmother and granted Mother supervised visitation.

*Section 387 Adjudication and Disposition Hearing*

In its July 8, 2021 addendum report for the section 387 adjudication and disposition hearing, the Agency recommended that the minors remain dependents of the court, that Mother's reunification services be terminated, and that a section 366.26 hearing be set. The minors remained placed with maternal great-grandmother, and Mother continued to have supervised visits twice a week. Mother admitted to using drugs and hanging around others who were using drugs.

The Agency's report listed Mother's other relapses in October 2019 (methamphetamine), November 2019 (amphetamine), and June 2020 (alcohol) in addition to the May and June 2021 positive tests. Mother stated she was willing to work with the Agency to readdress her substance abuse and willing to contact the substance abuse specialist. The Agency noted, however, that Mother had not maintained contact with her sponsor, had not reached out to her support system, and continued to use drugs, despite the minors' placement with her. The Agency further noted there had been approximately 26 months of services, that Mother had not been forthcoming

---

2    The record indicates that the minors have two maternal great-grandmothers, J.M. and K.W. All further unspecified references to "maternal great-grandmother" are to J.M., who later became the minors' caregiver.

with the Agency about her relapses, and that the minors deserved permanency.

As of August 2021, the minors remained detained with maternal great-grandmother and appeared comfortable and well-adjusted to her. Mother continued supervised visitation twice a week and told the Agency she attended Narcotics Anonymous meetings by Zoom one to two times a week. Mother did not appear at the September 16, 2021 continued hearing.

According to the Agency's October 28, 2021 addendum report, Mother said she thought it best for the minors to remain with maternal great-grandmother and that, while she loved her children, she acknowledged she had " 'work to do' " and wanted stability for them. Mother's last drug test in late September 2021 was negative.

Mother did not appear for the adjudication and disposition hearing. The court made true findings on the section 387 petitions, removed the minors from Mother's custody, terminated reunification services, and set a section 366.26 hearing.

*February 24, 2022 Section 366.26 Hearing and Report*

On February 24, 2022, the court held the scheduled section 366.26 hearing. The court granted the Agency's request for a continuance to May 23, 2022.

The Agency's corresponding section 366.26 report indicated that both minors were in the process of individualized education plan (IEP) assessments and that Zi.H. was diagnosed with Autism Spectrum Disorder with accompanying language impairment and Global Developmental Delay. The minors had remained under maternal great-grandmother's care since June 2021 when they were brought back into protective custody. Maternal great-grandmother reported that Mother's supervised twice weekly two-hour

8

visits were going well and that the minors did not show signs of "emotional distress" upon separation from Mother.

*May 23, 2022 Continued Section 366.26 Hearing and Report*

At Mother's attorney's request, the court continued the May 23, 2022 hearing to June 22, 2022, for a document trial.

The Agency's addendum report recommended the termination of parental rights and a permanent plan of adoption for the minors. Mother had continued with her twice-weekly visits of two to three hours with the minors, and maternal great-grandmother again indicated that the minors did not show signs of emotional distress at the end of visits. Maternal great-grandmother also reported that the minors requested visits and phone calls with Mother between their scheduled visits.

The social worker observed four two- to three-hour supervised visits on February 22, 2022; March 24, 2022; April 14, 2022; and May 12, 2022. At each of these visits, other adult relatives were present and appeared to assist Mother with managing the minors. At the visits, Mother fed the children and played with them, and the children called her "Mommy." During one of the visits, maternal great-grandmother arrived to pick up the minors, checked their diapers, and changed Z.H.'s diaper before leaving the park. During another visit, Zi.H. was on the swings and said to Mother, "Look at that house right there, that's the house where we belong." Each of the visits concluded without the minors showing any signs of emotional distress or separation anxiety.

After discussing permanency options with the Agency several times, maternal great-grandmother was only interested in adopting the minors, who had lived with her since June 2021. Both minors—who were approximately

9

three and four years old at the time of the report—had IEP's but were reaching developmental milestones with the support of services.

The Agency assessed both minors as specifically adoptable with maternal great-grandmother, who was motivated and willing to provide permanency through adoption and a safe and nurturing home. The minors had "thrive[d]" since their June 2021 placement with maternal great-grandmother, who had "consistently" met the minors' physical, developmental and emotional needs. The minors called her " 'Grama' " or " 'Grama GG' " and relied on her to meet all of their physical and emotional needs.

Mother did not attend the April 19, 2022 CFT meeting. At the meeting, the team and maternal great-grandmother discussed next steps for the minors, including follow ups with the pediatrician and orthopedics regarding Z.H.'s sensory/eating concerns and Z.H.'s pending neurology appointment.

In the Agency's addendum report, the social worker acknowledged that Mother appeared able to manage the minors' basic needs during visits and that the visits were appropriate, but noted that Mother "often needs assistance when they both want to play in different areas and struggles to manage the children without support during their limited 2-hour visit." The social worker opined that Mother's ability to continue to strengthen her relationship with the minors was "disrupted" by Mother's drug relapses, and although the minors recognized Mother as "Mommy," the benefits of adoption outweighed the risks of maintaining parental rights because the minors' stability would remain secure under a permanent plan of adoption. The worker further noted that the minors continued to progress in all areas of development in the absence of Mother and thus, it would not be detrimental to terminate parental rights. The worker recognized the minors "may

10

experience some adverse emotions and/or reactions to the termination of parental rights" and would "likely go through a period of grief and loss" but opined that this could be ameliorated through therapeutic services and with the ongoing care and stability provided by adoption. Finally, the worker noted that adoption would promote further stability for the minors due to their special needs and developmental challenges.

*June 22, 2022 Final Continued Section 366.26 Hearing and Report*

The Agency's addendum report indicated that Mother was no longer visiting the minors twice a week due to cancelling or not answering her phone at times. Although maternal great-grandmother reported Mother's visits continued to go well, they now averaged only once a week, and Mother no longer called the minors between visits, as she previously did. Maternal great-grandmother reported the minors still did not show signs of emotional distress at the conclusion of visits but that they would experience short periods of "emotional dysregulation" following a visit, such as being defiant or hyperactive, and that this would conclude before the next day.

At the June 22, 2022 hearing, the juvenile court received into evidence the section 366.26 Agency report and addendum reports from February 24, 2022; May 23, 2022; and June 22, 2022. Mother's attorney declined to cross-examine the social worker and did not offer any affirmative evidence. The court found the minors were both generally and specifically adoptable. The court further found that Mother had a relationship with the minors and called her "Mommy" but that Mother had a history of neglect and substance abuse that had "not been adequately addressed," and the Agency's concerns about Mother being a beneficial presence or dutiful mother were "real" considering the minors' "developmental needs that needed to be attended to on a consistent basis."

11

The court acknowledged that Mother visited the minors and that a relationship existed but found that "the permanency and the consistency and the stability and the fact that the children are together and thriving without the trauma of drugs reappearing in their life, the benefit of adoption outweighs any detriment that would exist if parental rights were terminated." The court followed the Agency's recommendations, terminated parental rights, and freed the minors for adoption.

Mother appeals.

## DISCUSSION

### I.

### *SUBSTANTIAL EVIDENCE SUPPORTS THE JUVENILE COURT'S FINDING THAT THE BENEFICIAL PARENT-CHILD RELATIONSHIP EXCEPTION DID NOT APPLY*

A. *General Legal Principles*

The permanency planning hearing aims "to end the uncertainty of foster care and allow the dependent child to form a long-lasting emotional attachment to a permanent caretaker." (*In re Emily L.* (1989) 212 Cal.App.3d 734, 742.) The Legislature prefers adoption where possible. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*), disapproved on another ground by *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5 (*Caden C.*).)

Once the juvenile court finds a child is adoptable, the parent bears the burden of proving that one of the exceptions to terminating parental rights

12

exists. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343.) One such exception is the beneficial parent-child relationship. (§ 366.26, subd. (c)(1)(B)(i).) For this exception to apply, the parent must show by a preponderance of the evidence: (1) regular visitation and contact with the child; (2) a beneficial parent-child relationship; and (3) that terminating the relationship would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Id.* at p. 634.)

We apply a hybrid standard of review on appeal. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530–531 (*In re J.C.*).) We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.) We review for abuse of discretion the juvenile court's finding that the termination of parental rights would not be detrimental to the child. (*Ibid.*; see also *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351 [practical difference between pure substantial evidence standard of review and hybrid standard of review is insignificant].) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd decision.' " ' " (*Caden C.*, at p. 641.)

13

B. *Analysis*

As to the first element required for the beneficial parent-child relationship exception to apply, the juvenile court found,[3] and substantial evidence shows, that Mother had regular and consistent visits and contact with the minors throughout much of the dependency. (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, *supra*, 11 Cal.5th at p. 636.)

Turning to the second element—the existence of a beneficial parent-child relationship—the juvenile court must "consider the evidence showing whether the parent's actions or inactions 'continued or developed a *significant, positive, emotional attachment* from child to parent.' " (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230 [italics added].) To determine whether the parent has established this element, the court considers factors including the age of the child, the amount of time the child spent in the parent's custody, the interaction between parent and child, and the child's needs. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The court should also examine "how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

Here, the juvenile court acknowledged that a relationship between Mother and the minors "does exist" and is one the minors recognize, including by calling Mother "Mommy." But the court stopped short of finding the relationship, although generally positive and loving, showed the existence of a "significant" "emotional attachment" between the minors and Mother.

That implicit finding is supported by substantial evidence. The minors were only around three and 18 months old when they were first removed from Mother's care in April 2019. Although Mother's improvements led to the minors' placement with her in February 2021, that placement was short-

---

[3] The juvenile court also found, and the parties do not dispute, that the minors were generally and specifically adoptable.

14

lived, lasting only about four months before the minors were again removed from Mother under a "safety plan." By the time of the section 366.26 hearing, the minors had been living with maternal great-grandmother for over a year and had spent most of their young lives outside of Mother's care.

The record shows that, shortly after the minors' second removal from Mother in June 2021, Mother again began having appropriate supervised visits with them. During these visits, Mother fed the minors snacks and played with the minors. The minors appeared to enjoy their visits with Mother, usually at public parks, and were playful and called her "Mommy." But at the conclusion of their visits with Mother, the minors never showed signs of emotional distress or separation anxiety. Moreover, after the visits, the minors would experience periods of "emotional dysregulation," including being defiant or hyperactive until the following day.

By the time of the June 22, 2022 section 366.26 hearing, Mother was no longer visiting the minors twice a week, and was canceling visits and inconsistent about answering her phone. She had also stopped calling the minors between visits, as she had done in the past.

Accordingly, substantial evidence supported the court's finding that the minors had a relationship with Mother but that they did not have the required significant emotional attachment to her for the beneficial parent-child relationship exception to apply. (See, e.g., *In re Dakota H.* (2005) 132 Cal.App.4th 212, 229 [a parent must demonstrate something "more than frequent and loving contact, an emotional bond with the child, or pleasant visits"]; *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 ["the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt"].)

Moreover, even assuming there was a beneficial parent-child relationship, we nevertheless conclude the juvenile court did not abuse its discretion in determining that the benefits offered by adoption outweighed any detriment caused by terminating parental rights. Mother's attorney did not present any evidence that the minors would be greatly harmed by severing Mother's relationship with them, or that the security and stability of adoption would not outweigh the loss of this relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Instead, the social worker's assessment concluded that terminating Mother's parental rights would *not* be detrimental to the minors because the minors "continue[d] to progress in physical, mental, emotional, and social areas of development in the continued absence of [Mother]," and their stability would "remain secure under a permanent plan of adoption."

The social worker explained that the minors were at a "critical stage of their development" due to their age, and they appeared to be "thriving" in their placement, including continuing to progress in all areas of their development. The social worker noted that adoption would promote even greater stability for the minors because of their special needs, including autism diagnoses and other developmental concerns. The social worker opined that Mother's ability to continue to strengthen her relationship with the minors had been "disrupted" due to her drug relapses. Although the social worker acknowledged the minors would likely go through a period of grief and might experience some adverse emotions in response to the termination of parental rights, she opined this could be mitigated with therapy and the ongoing stability and care afforded through adoption.

The juvenile court agreed with the social worker's assessment and concluded Mother's relationship with the minors was not sufficient to outweigh the benefits of adoption. (See *In re Autumn H.* (1994) 27

16

Cal.App.4th 567, 575.) The juvenile court was entitled to find the social worker credible and to give great weight to her assessment. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53, overruled on other grounds in *Caden C.*, *supra*, 11 Cal. 5th at p. 636; *In re Michael G.* (2012) 203 Cal.App.4th 580, 590 [juvenile court is entitled to rely on social worker's assessment report, which is cornerstone of evidentiary structure at § 366.26 hearing].) We cannot reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re Casey D.*, at p. 53.) Thus, on this record, we conclude that substantial evidence supported the court's finding, and the court did not abuse its discretion in determining the benefits of adoption outweighed any detriment that would exist by terminating parental rights. (See *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530–531.)

Mother complains it was improper for the Agency and juvenile court to cite her "unresolved methamphetamine use" in their determinations that terminating parental rights was appropriate.[4] But Mother misconstrues both the law and the Agency and juvenile court's comments. It is true that a juvenile court may not find "against a beneficial relationship *solely because* a parent has failed to surmount the issues that initially brought the child into dependency care—a standard that few parents facing termination of parental rights could hope to meet." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 309 [citing *Caden C.*, *supra*, 11 Cal.5th at p. 640].) However, the juvenile court was not prohibited from determining that the harmful impact of Mother's unresolved drug abuse on the minors undermined the type of beneficial

---

[4]     Mother also complains that minors' counsel cited Mother's drug use during argument, but Mother offers no citations to the record to support this contention. Nor have we located any. Indeed, minors' counsel did not offer any argument during the section 366.26 hearing.

17

relationship required for the exception to apply.  (See *ibid*.)  That is precisely the case here.

As the California Supreme Court recently explained, "[a] parent's struggles may mean that interaction between parent and child at least sometimes has a 'negative effect' on the child." (*Caden C., supra*, 11 Cal.5th at p. 637.)  Based on the juvenile court's comments, we conclude this was the court's concern.  For example, the court, in referring to the minors "thriving [in their placement] without the trauma of drugs reappearing in their life," considered Mother's drug abuse from the perspective of the minors and *its impact on them*; the court's observation was not a moral judgment of Mother or used to punish her.  (Cf. *Caden C.*, at p. 638 ["The parent's continuing difficulty with mental health or substance abuse may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent."].)  As to the court's observation that Mother's history of drug abuse had not been adequately addressed, the court made this comment because it agreed with the Agency's concerns about Mother posing a beneficial presence and the children's special developmental needs, which the court observed require consistency.

Moreover, the record amply supports the court's finding that Mother's drug abuse negatively impacted the minors and undermined the strength of their relationship.  Mother's relapses, once for methamphetamine and another time for methamphetamine and cocaine, both occurred while she was supervising the minors.  When the Agency visited Mother during this period in the afternoon, it found her laying in bed and complaining of being tired, while the minors remained undressed and in diapers.  Mother, herself, previously admitted that her drug use affected her judgment on properly

18

feeding the minors. And during oral argument, the Agency noted its assessment that Mother's "unresolved drug history has directly impeded her ability to form a positive parent-child relationship with [the minors]." The Agency was referring to the social worker's assessment that Mother's ability to continue to strengthen her relationship with the minors had been "disrupted" by her relapses.

Finally, the social worker's assessment and the juvenile court's comments at the section 366.26 hearing indicate that their determinations properly and heavily depended on the "permanency," "stability," and "consistency" offered by adoption outweighing any potential detriment caused by terminating parental rights. Accordingly, we conclude the Agency and court properly considered the impact of Mother's drug abuse on the minors and how it weakened their relationship with Mother *as one factor*, not as a categorical bar to the exception applying. (Cf. *In re B.D.* (2021) 66 Cal.App.5th 1218, 1228 [reversal of section 366.26 order based upon juvenile court having "relied heavily, if not exclusively, on the fact that the parents had not completed their reunification plans and were unable to care for the children based on their long term and continued substance abuse"]. Mother has not demonstrated error, and it will not be presumed here. (See *People v. Tang* (1997) 54 Cal.App.4th 669, 677 [" 'We must indulge in every presumption to uphold a judgment, and it is [appellant's] burden on appeal to affirmatively demonstrate error—it will not be presumed."].)

Mother further complains about minors' counsel's "improper" argument that the minors would likely continue to have contact with Mother because they were being adopted by a relative. Mother is correct that a juvenile court should not consider this factor in evaluating whether the beneficial parent-child relationship exception applies. (See *In re J.D.* (2021) 70 Cal.App.5th

19

833, 867–868.) But there is simply no indication that, in reaching its decision, *this* juvenile court relied on that argument. Instead, as discussed previously, the court determined Mother's relationship with the minors did not outweigh the stability and other benefits offered by adoption, particularly considering the minors' special needs.

For the previous reasons, substantial evidence supports the juvenile court's finding that the beneficial parent-child relationship exception did not apply.

## II.

### *ANY NOTICE ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT*

A. *Additional Background*

On February 24, 2022, the juvenile court held the originally scheduled section 366.26 hearing. Mother and her attorney appeared telephonically. Before the hearing, the Agency filed a proof of service for Mother showing that Mother was personally served on January 12, 2022 with notice of the February 24, 2022 section 366.26 hearing. The notice also reflected the social worker's recommendation that parental rights be terminated and a plan of adoption be implemented.

Based on the proof of service, the juvenile court found the requisite notice was given to and "preserved" as to Mother. Neither Mother nor her attorney objected at the hearing to the court's notice finding. The court then granted the Agency's request for a continuance and continued the section 366.26 hearing to "May 23 of 2022 at eight o'clock in this department." On the record, the court also advised Mother to "please stay in touch with your attorney . . . [and] with the Agency," and Mother stated her agreement. The juvenile court stated, "We'll see everybody at the next hearing," and its minute order provided, "All parties are ordered to return."

20

Although Mother's attorney appeared at the continued section 366.26 hearing on May 23, 2022, Mother did not. The court reiterated its finding that notice had been given to Mother. Mother's attorney asked the court to set the section 366.26 hearing as a document trial for which the parties had "preselected a date," and the court set the hearing for June 22, 2022. Mother's attorney did not indicate that Mother would be testifying, and the court did not order Mother's attorney or the Agency to provide notice of the continued hearing to Mother.

At the continued section 366.26 hearing on June 22, 2022, the court was unable to reach Mother, despite trying to call her twice. Mother's attorney stated, "I was unable to contact my client so I request a continuance." The court denied the continuance request because of its finding that notice had been properly given to all parties. The record does not indicate whether Mother ever received notice—either from her attorney or the Agency—of the continued June 22, 2022 hearing.

The juvenile court received into evidence the section 366.26 Agency report and addendum reports from February 24, 2022; May 23, 2022; and June 22, 2022. Mother's attorney declined to cross-examine the social worker and did not offer any affirmative evidence. She argued that the court should find the beneficial parent-child bond exception applied and noted that Mother had consistently visited the minors, that they called her "Mommy," and that she believed the minors would suffer a detriment if Mother's relationship were terminated.

B. *Analysis*

In her opening brief, Mother asserts that the juvenile court "terminated [her] parental rights after finding notice proper" but that the Agency "did not provide notice to mother of continued dates for the section 366.26

21

permanency hearings." Aside from including a short factual section in her brief under the subheading, "Notice," Mother failed to address the notice matter again. Nor did she provide any argument or authority to support her position.

As a preliminary matter, because the juvenile court found notice of the section 366.26 hearings on Mother was proper, it was Mother's burden on appeal to affirmatively demonstrate error. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1161 [" ' "[w]e must indulge in every presumption to uphold a judgment, and it is [appellant's] burden on appeal to affirmatively demonstrate error—it will not be presumed' " "]; *In re J.F.* (2019) 39 Cal.App.5th 70, 79 ["[t]he juvenile court's orders are 'presumed to be correct, and it is appellant's burden to affirmatively show error' "]; *In re Sade C.* (1996) 13 Cal.4th 952, 994 [presumption casts burden on appellant to present argument and authority on each point; otherwise, the point is deemed abandoned].) Yet, she failed to do so.

Regardless, and even considering the merits of Mother's notice argument, we conclude any notice error was harmless.[5] Parents are entitled to special notice of a section 366.26 hearing pursuant to section 294, which

---

[5] Defects in notice—whether they be statutory or constitutional in nature—are subject to harmless error analysis, except in the "narrow category" of cases in which the party charged with giving notice makes "absolutely" "no attempt" to do so. (*In re A.D.* (2011) 196 Cal.App.4th 1319, 1327; *In re Jesusa V.* (2004) 32 Cal.4th 588, 624 ["We typically apply a harmless-error analysis when a statutory mandate is disobeyed, except in a narrow category of circumstances."]; *In re Daniel F.* (2021) 64 Cal.App.5th 701, 715–716 [where agency makes "little to no effort" to provide notice, harmless error analysis applied]; cf. *In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1115–1116 [where agency makes "no attempt" to provide notice to parent, error is structural and reversible per se without examination of whether error was harmless].)

22

specifies the necessary contents, timing, and methods for service. Notice may be given in a variety of manners, including by personal service. (§ 294, subd. (f)(3).) Unless the Agency's recommendation changes after the juvenile court makes its initial finding that notice has been properly given, "subsequent notice for any *continuation* of a Section 366.26 hearing may be by first-class mail to any last known address, by an order made pursuant to Section 296, . . . or by any other means that the court determines is reasonably calculated, under any circumstance, to provide notice of the continued hearing. . . ." (§ 294, subd. (d) [italics added].) Section 296 allows the court to order that parties who are present at a hearing return to court.

The May 23, 2022 and June 22, 2022 section 366.26 hearings were continuations of the section 366.26 hearing first held on February 24, 2022. Mother does not challenge the sufficiency of the formal notice she received— by personal service—for the original February 24, 2022 hearing. Nor does Mother deny that the notice contained the Agency's ongoing recommendation that her parental rights be terminated and a permanent plan of adoption ordered. Instead, Mother complains she did not receive notice of the two *continued* hearings on May 23, 2022 and June 22, 2022.

As to notice of the first continued hearing on May 23, 2022, the record shows Mother was telephonically present at the initial February 24, 2022 hearing during which the court ordered the continuance to May 23, 2022. Indeed, immediately after ordering the time and place of the continued hearing, the juvenile court reminded Mother to stay in touch with her attorney and the Agency, and Mother agreed. The juvenile court stated, "We'll see everybody at the next hearing," and pursuant to section 296, its minute order provided, "All parties are ordered to return." Further, the Agency's recommendation to terminate parental rights, first articulated in

23

the initial notice served on Mother, did not change. (Cf. § 294, subd. (d) [where agency recommendation changes between initial and continued hearing, notice shall be provided of the subsequent hearing].) Thus, we conclude Mother received notice of the first continued hearing on May 23, 2022. (See § 294, subd. (d) [notice of subsequent hearing may be accomplished "by an order made pursuant to Section 296, . . . or by any other means that the court determines is reasonably calculated, under any circumstance, to provide notice of the continued hearing"]; § 296 [court may order all parties present at hearing to return].)

As to the *second* continued hearing on June 22, 2022, however, we conclude Mother did not receive notice and that this was error. At the May 23, 2022 continued hearing during which the June 22, 2022 continuance was ordered, Mother's attorney appeared, but Mother did not. There is nothing in the record indicating that Mother was served by mail, e-service, or any other means with notice of the hearing's continuance to June 22, 2022. And considering Mother's attorney's request for another continuance at the June 22, 2022 hearing because she "was unable to contact [her] client," we also cannot presume that Mother received notice through her attorney. Thus, at the June 22, 2022 hearing, the juvenile court could not properly find Mother had received notice and proceed to terminate her parental rights.

Nonetheless, we conclude this notice error was harmless beyond a reasonable doubt.[6] Importantly, although the court had every right to

_____

[6]     The California courts are currently divided regarding the standard by which harmlessness is to be assessed. Some courts ask whether the defect in notice was harmless beyond a reasonable doubt. (*In re Steven H.* (2001) 86 Cal.App.4th 1023, 1033; *In re Mark A.* (2007) 156 Cal.App.4th 1124, 1146; *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1419; *In re Justice P.* (2004) 123 Cal.App.4th 181, 193.) Other courts ask whether, had the defect in notice not occurred, there is a reasonable probability of a more favorable outcome. (*In*

24

proceed without Mother at the first continued hearing on May 23, 2022, Mother did not appear at that hearing despite having notice of it. Moreover, Mother's prior participation in dependency proceedings was inconsistent at best: she missed many previous dependency hearings, despite having notice of them. Thus, there is no reason to believe Mother would have attended the June 22, 2022 second continued hearing, even had she received proper notice. (Accord, *In re James F.*(2008) 42 Cal.4th 901, 916 [looking to what the party who did not receive proper notice "would have" done had they received proper notice].)

Furthermore, there is no possibility that the outcome of the June 22, 2022 hearing would have been any different had Mother attended. (See e.g., *In re Angela C.* (2002) 99 Cal.App.4th 389, 395–396 (*Angela C.*) [looking to whether the result of the section 366.26 hearing would have been different].) Given that Mother's attorney requested a document trial and never raised calling Mother as a witness, there is no indication that Mother would have testified, even had she attended the hearing. Moreover, the sole issues at the hearing were whether the minors were adoptable and whether any exception to adoption applied. There is no basis to contest that the minors were adoptable, and the record forecloses the applicability of the only relevant exception to adoption—the beneficial parent-child relationship exception. As discussed in detail previously, the minors had spent most of their young lives outside of Mother's care, had special needs requiring consistent care and attention, were thriving in their placement where they had lived for over a

re Al.J. (2019) 44 Cal.App.5th 652, 665; *In re Daniel F.* (2021) 64 Cal.App.5th 701, 715–716; accord, *In re Jesusa V.* (2004) 32 Cal.4th 588, 625.) We need not weigh in on the split because any defect in the notice given to Mother satisfies the more stringent harmless error test: the notice defect in this case was harmless beyond a reasonable doubt.

year, and showed no emotional distress at the conclusion of their visits with Mother. Mother could not have produced evidence changing these facts or showing detriment to the minors sufficient to overcome the benefits afforded by adoption. And tellingly, Mother offers no argument on appeal as to how her participation at the hearing would have changed these facts or impacted the hearing's outcome.

Accordingly, we conclude the defect in notice was harmless beyond a reasonable doubt. (See *Angela C.*, *supra*, 99 Cal.App.4th 389 [lack of notice to mother of continued section 366.26 hearing was harmless where she had notice of the first section 366.26 hearing and the opportunity to be heard, her participation in prior dependency proceedings was poor, and despite being properly notified of the original section 366.26 hearing date, she failed to attend it or notify anyone as to her position].)

III.

*LIMITED REMAND IS REQUIRED FOR ICWA COMPLIANCE*

A. *Additional Background*

At the outset of the dependency proceedings, Mother reported she had Cherokee ancestry but was not registered with a tribe.[7] Maternal great-grandmother (J.M.) said her mother had mentioned "Cherokee and Creek" and that maternal great-great-great-great-grandmother was "full-blooded [Native American]." The Agency further noted that (deceased) maternal great-great and great-great-great-grandmothers both had Cherokee and/or Creek ancestry.

---

[7] The Agency also questioned Z.H.'s alleged father, J.R., who claimed Blackfoot or Cherokee ancestry, but J.R. was later found not to be Z.H.'s biological father. Therefore, we need not and do not include the Agency's follow-up efforts with J.R. in this discussion.

26

Maternal grandfather reported that he previously lived on Pala, Pauma, and San Pasqual reservations and that his connection with the tribes "started with his uncle." According to the Agency's notes, maternal grandfather claimed Cherokee ancestry and said the Sycuan considered him family and took him in as family. There is no indication in the record that the Agency ever contacted the tribes associated with the reservations identified by maternal grandfather.

The Agency also conducted ICWA inquiries with maternal grandmother and the other maternal great-grandmother (K.W.), both of whom denied having any Native American heritage. [8]

In June 2019, the Agency noted that Mother identified B.W. and E.W. as the minors' alleged fathers. Later that month, B.W. filed an ICWA-020 form stating that, to his knowledge, he had no Native American ancestry. B.W. also attended the jurisdictional and dispositional hearing the same month.

In a report submitted to the juvenile court, the Agency represented that it "noticed via certified mail" all Cherokee and Creek tribes on June 12, 2019. In its July 23, 2019 addendum report, the Agency identified each of the eight tribes and the Bureau of Indian Affairs (BIA) office to whom it mailed notice, and attached the responses received from the tribes to date. The Agency's reports do not contain the notice letters that the Agency mailed to the tribes or the letters' contents.

---

[8] The record refers to both J.M. and K.W. as "maternal great-grandmother" or "the other maternal great-grandmother" without any further explanation. Therefore, although the minors share the same mother, we assume that both J.M. and K.W. are the minors' maternal great-grandmothers for the purposes of ICWA.

At the July 23, 2019 pretrial status conference, the juvenile court deferred making its ICWA finding "pending the tribal responses" because three tribes had not yet responded to the Agency.

Two days later, B.W. spoke with the Agency by phone and again denied having any Native American ancestry.

On July 30, 2019, the court found B.W. to be the biological father of Z.H. The court granted the Agency's request for a continuance of the adjudication and disposition hearing to "meet and assess [B.W.], and to receive [ICWA] responses." There is no indication the Agency ever contacted or attempted to contact B.W.'s family members about Z.H.'s potential Native American ancestry.

At a later pretrial status conference, the Agency informed the court that it was still waiting for responses from "some of the tribes" to whom it mailed notice letters in June. The court again deferred making an ICWA finding "pending the tribal responses."

By August 27, 2019, the Agency reported that seven of the eight tribes had responded—either in writing or by phone—that the minors were not eligible for membership.[9] The Agency had not yet received a response from the Cherokee Nation of Oklahoma, which told the Agency that it would not be able to provide a response until approximately mid-September or October 2019.

B.W. attended the August 27, 2019 hearing, but there is no indication in the minute order that he was asked for his relatives' contact information so that the Agency could conduct ICWA inquiries with them. The court made

_____

[9] Although the Agency's August 27, 2022 report indicated it was also still waiting for a response from the Muscogee (Creek) Nation, the Agency's prior July 23, 2022 report indicated that the tribe had responded that the minors were not eligible for membership.

a true finding on the minors' petitions, removed custody from Mother, and found without prejudice that ICWA did not apply based on the information provided by the Agency.

When the Agency filed section 387 petitions to remove the minors from Mother in June 2021, the Agency also filed ICWA-010 forms for both minors, stating, "I understand that I have an affirmative and continuing duty to complete this [ICWA] inquiry. I will do it as soon as possible and advise the court of my efforts." In the associated detention report, the Agency stated— without explanation—"The Indian Child Welfare Act does not apply." As of this report, the Agency had been in touch with B.W. several times but had not been able to locate E.W. There is no indication in the record that the Agency conducted any additional inquiries into ICWA after filing the section 387 petitions.

Although the Agency reported that it had substantive calls with B.W. on June 14, 2021 and August 25, 2021 about visitation and housing status, there is no indication that the Agency ever asked him for the names and contact information of his relatives, which it needed to conduct ICWA inquiries. In its July 8, 2021 report, the Agency noted an updated address for B.W. As of its October 2021 addendum report, the Agency still had not been able to locate E.W.

In the Agency's February 24, 2022 section 366.26 report, the Agency reiterated that on August 27, 2019, the court had found ICWA did not apply. In a declaration of due diligence from the same date, the Agency indicated that, in December 2021, it had reached E.W.'s grandmother (Zi.H.'s paternal great-grandmother) for whom the Agency had a phone number and address. Zi.H.'s paternal great-grandmother said she did not know E.W.'s contact information and saw him every four to five weeks. She also provided the

names of E.W.'s father (Zi.H.'s paternal grandfather) and mother (Zi.H.'s paternal grandmother) but did not feel comfortable disclosing their contact information. The Agency reported several follow-up calls to Zi.H.'s paternal great-grandmother and that she stated she would tell E.W. and the other family members to call the social worker, but the social worker never received any calls. After three unsuccessful calls to paternal great-grandmother on February 7, 10, and 11, 2022, the Agency stopped trying to reach her.

The Agency also indicated it reached E.W.'s grandfather (Zi.H.'s paternal great-grandfather) by phone and that he provided some details about E.W. and their relationship. Again, the Agency did not ask paternal great-grandfather for the names and contact information of Zi.H.'s extended family members. There is also no indication that the Agency ever asked Zi.H.'s paternal great-grandfather or paternal great-grandmother about Zi.H.'s potential Native American ancestry.

In a May 2022 declaration of due diligence regarding B.W., the Agency reported that it had not been able to reach B.W. for several months. Other sources, including maternal great-grandmother (J.M.) reported that B.W. was attending visits back in December 2021 supervised by the other maternal great-grandmother (K.W.) and that B.W. still lived in San Diego but was "gone for a little bit." On February 11, 2022, B.W.'s attorney told the Agency that he did not have B.W.'s updated contact information.

Although the juvenile court did not address ICWA at the June 22, 2022 contested section 366.26 hearing, the court minutes for that hearing indicate the court found without prejudice that ICWA did not apply.

B. *Analysis*

Congress enacted ICWA to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement

with non-Indian families. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) Under California law, the juvenile court and Agency have an "affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (§ 224.2, subd. (a); see *Isaiah W.*, at p. 9.)

"[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*In re D.S.*).)

A juvenile court finding that ICWA is inapplicable generally implies that the Agency has fulfilled its inquiry duty. (See *In re Austin J.* (2020) 47 Cal.App.5th 870, 885.) We review ICWA findings for substantial evidence, but "where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1051.)

In her opening brief, Mother contends that the orders terminating her parental rights should be reversed with instructions to the juvenile court to "conduct appropriate ICWA inquiry." The Agency responds only that Mother "forfeit[ed]" a claim of error under ICWA by failing to provide any further argument. Nonetheless, because of the "affirmative and continuing duty to inquire" under ICWA (*Isaiah W.*, *supra*, 1 Cal.5th at p. 9), the "separate and

31

distinct" nature of tribes' interests protected by ICWA (*Id.* at p. 13), and the fact that "a hearing to consider the termination of parental rights is likely the last practical opportunity for any relevant Indian tribe to intervene in a proceeding" (*In re S.H.* (2022) 82 Cal.App.5th 166, 178–179 (*In re S.H.*)), we consider the matter. On this record, we conclude that the Agency and court failed to comply with their inquiry duties under ICWA and that these errors were prejudicial. Therefore, we conditionally reverse the orders terminating parental rights and remand for compliance with ICWA.

1. *Initial Inquiry*

The Agency's duty of initial inquiry " 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.' " (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1049.) ICWA defines " 'extended family member' " by "the law or custom of the Indian child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [extended family member "defined as provided in [§] 1903" of ICWA].)

Here, the Agency failed to conduct ICWA inquiries with either minor's paternal extended family members. For example, the record on appeal indicates that, throughout the dependency proceedings, B.W. (Z.H.'s father) and the Agency had multiple substantive discussions by phone and were in regular contact, and that B.W. attended several dependency hearings. Yet, there is no indication that the Agency ever asked B.W. for the names and contact information of his relatives or conducted ICWA inquiries with even

32

one of Z.H.'s paternal extended family members. The Agency should have tried to identify and locate Z.H.'s paternal extended family members and asked them about Z.H.'s potential Native American ancestry.[10]

Likewise, the Agency failed to conduct any ICWA inquiries with Zi.H.'s paternal extended family members (relatives of Zi.H.'s alleged father, E.W.). We recognize the Agency could not locate E.W., but the Agency was in repeated contact with Zi.H.'s paternal great-grandmother, who shared the names of Zi.H.'s paternal grandparents. Yet, aside from asking paternal great-grandmother one time for paternal grandparents' contact information, there is no indication that the Agency ever attempted to conduct ICWA inquiries with paternal grandparents. Nor did the Agency ask paternal great-grandmother for the names of any other extended family members who might have information bearing on Zi.H.'s potential Native American ancestry.[11] Similarly, the Agency never asked paternal great-grandfather, whom it also reached by telephone, for the names and contact information of

---

[10] Indeed, the Agency acknowledged its continuing and affirmative duty to do so in its June 2021 section 387 petitions, stating that it would complete the ICWA inquiry "as soon as possible and advise the court of my efforts." Yet, there is no indication that the Agency conducted *any* ICWA inquiry following this representation to the court, much less that it did so with Z.H.'s extended paternal family members or advised the court of its efforts. (See *In re S.H.*, 82 Cal.App.5th at p. 176 ["agency has a duty 'on an ongoing basis' to report 'a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status.' "].)

[11] To the extent the Agency believes paternal great-grandmother was not reasonably available, we are unpersuaded by its efforts documented in the record. The Agency's notes indicate it stopped trying to reach paternal great-grandmother after only a few unsuccessful phone calls in February 2022, and there is no indication that the Agency tried to reach her at the mailing address she had provided.

Zi.H.'s paternal extended family members. The Agency should have done so. (See *In re K.R.* (2018) 20 Cal.App.5th 701, 707−708 [holding that "actions [the Agency] was required to undertake" included contacting paternal grandfather for paternal great-grandfather's contact information and contacting great-grandmother for information about paternal grandfather and paternal great-grandfather].)

Because the Agency's initial ICWA inquiry was deficient, substantial evidence does not support the juvenile court's finding that ICWA did not apply.

2. *Further Inquiry*

Our review of the record also establishes that the Agency's duty of further inquiry was triggered but deficient.

The Agency has a duty of further inquiry where there is reason to believe a child is an "Indian child." (§ 224.2, subd. (e).) As amended in 2020, section 224.2 specifies that "[t]here is *reason to believe* . . . whenever the court, social worker, or probation officer has information *suggesting* that either the parent of the child or the child is a member *or may be* eligible for membership in an Indian tribe." (*Id.* at subd. (e)(1), italics added.)

Here, the Agency's duty of further inquiry was triggered because Mother and the maternal extended family members' claims of Native American ancestry constituted "information suggesting" that each minor "is a member or may be eligible for membership in an Indian tribe." (See e.g., *In re Rylei S.* (2022) 81 Cal.App.5th 309, 314, 319 (*Rylei S.*) [mother's statement on ICWA-020 form that she "may have" Cherokee heritage on maternal grandfather's side triggered duty of further inquiry]; *In re T.G.* (2020) 58 Cal.App.5th 275, 294–297 (*In re T.G.*) [broadly interpreting "reason to

34

believe" to conclude that mother's claim of Native American ancestry on her maternal side triggered duty of further inquiry].

The duty of further inquiry includes, "but is not limited to," (1) interviewing extended family members to gather the biographical information required by section 224.3, subdivision (a)(5); (2) contacting the BIA and State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member or eligible for membership; and (3) contacting the tribes and anyone else who "may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(A)-(C).) Contact with a tribe, for the purpose of fulfilling the Agency's duty of further inquiry, "shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under [ICWA]" and "include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (*Id.* at subd. (e)(2)(C).)

Although the Agency documented that it mailed notice letters to eight tribes and to the BIA, the record is devoid of the actual letters sent and what information was provided to the BIA and tribes in those letters. Thus, the juvenile court had no evidence from which to conclude the letters were adequate. (See e.g., *In re Karla C.* (2003) 113 Cal.App.4th 166, 178 (*Karla C.*) ["Without a review of the notices, the juvenile court [wa]s unable to determine whether they complied with the ICWA . . . and gave the Bureau or the tribe all known relevant information and a meaningful opportunity to determine whether the [minors] [are] . . . Indian child[ren] within the meaning of the ICWA."].)

35

Moreover, at the time of the August 27, 2019 hearing, the Agency informed the juvenile court that it was still waiting for a response from the Cherokee Nation, which had indicated it would provide a response by mid-September or October 2019. Although the Agency was still awaiting this response, the juvenile court adopted the Agency's recommended finding that there was no reason to believe ICWA applied—a finding it reiterated, without any additional documentation by or information from the Agency, at the section 366.26 hearing several years later.[12]

Finally, despite maternal great-grandfather's identification of three reservations upon which he lived in the past and his statement that his connection with the tribes "started with his uncle," it does not appear that the Agency ever conducted inquiries with any of the tribes associated with those reservations or pursued this line of inquiry any further.

Accordingly, we conclude the Agency failed to satisfy its further inquiry obligations under ICWA, and there was insufficient evidence in the record for the court to determine that ICWA did not apply.

3. *Prejudicial Error*

We next consider whether the ICWA inquiry errors were harmless. This division has adopted the approach articulated in *In re Benjamin M.* (2021) 70 Cal.App.5th 735 (*Benjamin M.*) for determining whether an ICWA inquiry error is harmless or prejudicial. (*In re Y.M.* (2022) 82 Cal.App.5th 901, 916.) Under *Benjamin M.*, "a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information

---

[12]    The record is also devoid of documentation of any additional follow-up efforts by the Agency, or the Cherokee Nation's ultimate response to the inquiry, even in the years following the juvenile court's initial ICWA finding.

that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M., supra,* 70 Cal.App.5th at p. 744.) This "standard does not require 'proof of an actual outcome (that the parent may actually have Indian heritage).' The missing information need only be relevant to the ICWA inquiry, 'whatever the outcome will be.' " (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 679; *id.* at p. 680 [applying *Benjamin M.* standard and finding reversible initial inquiry error where agency "asked the parents about Indian ancestry" but "failed to ask extended family members about it"].)

On this record, we cannot say the Agency's failure to comply with its initial inquiry duty was harmless. Extended family members were readily available,[13] and their responses would likely bear meaningfully on the minors' potential Native American status, regardless of the outcome of the inquiry.[14] (*Benjamin M., supra,* 70 Cal.App.5th at p. 744.) This is

---

[13] On remand, and to the extent the Agency contends extended paternal family members are not readily available to answer questions regarding ICWA, it should clearly document its efforts to conduct ICWA inquiries with them. At present, the Agency's vague records about its contacts with some paternal relatives while trying to notify the fathers of the section 366.26 hearings currently weigh against a harmless error finding. (See *Benjamin M., supra,* 70 Cal.App.5th at pp. 745–746 ["When assessing whether ICWA inquiry error was harmless, a court must know enough about the persons contacted to determine if the agency failed to inquire of persons who might have helpful information; murky documentation of the agency's efforts may support a reasonable inference that it failed to do so."].)

[14] As to Z.H., B.W.'s denial of any Native American ancestry does not relieve the Agency of its "broad duty" to inquire of readily ascertainable extended family members whether Z.H. is an Indian child. (*In re Y.W.* (2021) 70 Cal.App.5th 542, 554.) A contrary rule would "ignore[ ] the reality that parents may not know their possible relationship with or connection to an Indian tribe." (*Id.* at p. 554; *In re S.R.* (2021) 64 Cal.App.5th 303, 314 ["the children's parents apparently had no idea of their family's connection to the . . . tribe . . . , even though the children's great-grandmother was a

particularly so because the Agency did not conduct ICWA inquiries with a single paternal extended family member of either minor.

Moreover, because Mother and other maternal relatives claimed Native American ancestry—including with tribes that were never mailed inquiry letters and/or never responded to the Agency—we also cannot conclude that the Agency's deficient further inquiry was harmless. (See e.g., *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744; see also *Karla C., supra*, 113 Cal.App.4th at pp. 178–179 [holding inquiry error was prejudicial where juvenile court could not have known what information the Agency sent to the tribe].)

Accordingly, on this record, we must conditionally reverse the orders terminating parental rights and remand for compliance with ICWA. Given the importance of expediency and need for finality, we encourage the parties to stipulate to immediate issuance of the remittitur in this case. (Cal. Rules of Court, rule 8.272(c)(1).)

---

member"]; see also *In re T.G., supra*, 58 Cal.App.5th at p. 295 [noting that ICWA's "expansive" duty of inquiry "is premised on the commonsense understanding that, over time, Indian families, particularly those living in major urban centers . . . , may well have lost the ability to convey accurate information regarding their tribal status"]; *Rylei S., supra*, 81 Cal.App.5th at pp. 321–322 [same].)

DISPOSITION

The juvenile court's orders terminating parental rights are conditionally reversed. The matter is remanded to the juvenile court with directions to comply with the inquiry provisions of ICWA and section 224.2 (and, if applicable, the notice provisions under section 224.3). If, after completing its inquiry, neither the Agency nor the juvenile court has reason to believe or reason to know that Z.H. and/or Zi.H. are Indian children, the orders shall be reinstated. If the Agency or the juvenile court has reason to believe or reason to know Z.H. and/or Zi.H. are Indian children, the juvenile court shall proceed accordingly. In all other respects, the orders are affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.